Henry G. Jones
Kenneth R. Friedman
Ronald J. Park
Friedman Rubin PLLP
1109 1st Avenue, Suite 501
Seattle, WA 98101
206-501-4446

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

JERREL HOWARD, an individual;

Plaintiff,

v.

3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company; AGC CHEMICALS AMERICAS INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER FIRE & SECURITY AMERICAS CORPORATION; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC.; DYNAX CORPORATION; EIDP, INC., f/k/a E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; KIDDE PLC, INC.; NATIONAL FOAM, INC.; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; and TYCO FIRE PRODUCTS L.P., individually and as successor in interest to The Ansul Company;

Defendants.

Case No. _____

**COMPLAINT FOR DAMAGES**

COMPLAINT FOR DAMAGES

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................1

II.   IDENTITY OF THE PARTIES.............................................................2

    A.  Identity of the Plaintiff. ...........................................................2

    B.  Identities of the Defendants. ....................................................2

III.  JURISDICTION AND VENUE .........................................................15

    A.  The Eastern District of Washington has jurisdiction. ...................15

    B.  Venue is proper in the Eastern District of Washington. ................16

IV.   FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING ...............................................................................16

    A.  AFFF is harmful to human health, animals, and the environment....................16

    B.  Manufacturer Defendants have manufactured and sold AFFF products for decades. .......................................................................20

    C.  Manufacturer Defendants knew, or should have known, that their AFFF products containing PFAS were harmful to the environment and human health. ............22

        1.    3M knew, or should have known, of the harm caused by PFAS, and 3M suppressed negative information about these chemicals.........................22

        2.    Old DuPont knew, or should have known, of the harms caused by PFAS, and it concealed its knowledge from regulators and user of AFFF products. .................................26

        3.    The Remaining Manufacturer Defendants knew, or should have known, of the harm caused by the release of PFOA from their AFFF products.......31

        4.    Manufacturer Defendants worked together through the Firefighting Foam Coalition to protect AFFF products from scrutiny................................32

COMPLAINT FOR DAMAGES – i

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

D. Manufacturer Defendants made affirmative misrepresentations and material omissions in their marketing of AFFF products. ...............................................33

E. PFAS from AFFF harmed Plaintiff and his property.........................................36

　　1.　The Contamination of Medical Lake, WA. ............................................. 36

　　2.　Health Effects of PFOS and PFOA Exposure. ....................................... 39

　　3.　Contamination and Harm to Plaintiff's Property..................................... 41

F. Old DuPont undertook a multi-step, years-long fraudulent scheme to isolate its valuable tangible assets from its PFAS liabilities and hinder creditors.............42

　　1.　Step 1: The Chemours spinoff....................................................................50

　　2.　Step 2: The Old Dow/Old DuPont "merger."...........................................57

　　3.　Step 3: The shuffling, reorganization, and transfer of valuable assets away from Old DuPont and separation of Corteva and New Dow....................58

G. Old DuPont, Chemours, New DuPont, and Corteva's years-long conspiracy to defraud their creditors has stripped away valuable assets otherwise available to satisfy Old DuPont's legacy liabilities. ..............................................................63

V.　CAUSES OF ACTION ...............................................................................................66

VI.　PRAYER FOR RELIEF ...........................................................................................89

VII. JURY DEMAND .......................................................................................................90

COMPLAINT FOR DAMAGES – ii

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

## I.    INTRODUCTION

1.1    For decades, the Defendants in this case manufactured, marketed, and sold firefighting foams to public agencies and private parties for use in Washington state even though they knew their products contained "forever chemicals" that would pollute Washington's lands and waters and harm people, wildlife, and fish.

1.2    To protect their profits, Defendants hid information from the public about the persistence, bioaccumulation, and toxicity of these "forever chemicals"— per- and polyfluoroalkyl substances commonly known as PFAS—claiming that they were "benign" and "biodegradable" when they knew these claims to be false.

1.3    Because of Defendants' manufacturing, marketing, promoting, distributing, and selling of these dangerous chemicals and their deception about the products' dangers, these firefighting foams have been used widely throughout Washington for decades and have profoundly contaminated many drinking water sources, leaving many people in Washington ill and many fish unsafe to eat.

1.4    Plaintiff Jerrel Howard, a resident of the State of Washington and the owner of real property within the state, therefore brings this civil action for compensatory and punitive damages, along with costs incurred and to be incurred, and any other relief that the Court or jury may deem appropriate for damages caused by the intentional, malicious, knowing, reckless, and/or negligent acts and/or omissions of Defendants in connection with Aqueous Film-Forming Foam ("AFFF")

COMPLAINT FOR DAMAGES – 1

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA  98101
(206) 501-4446

containing PFAS.

## II.    IDENTITY OF THE PARTIES

### A.    Identity of the Plaintiff.

2.1    Plaintiff Jerrel Howard is a citizen of the United States of America and a current resident of Medical Lake, Washington in Spokane County. Mr. Howard owns approximately 10.9 acres of land in Medical Lake, which he purchased in 1981. Approximately 1 acre of the land is covered by water, consisting of 3 large ponds and 12 small ponds. Mr. Howard's ownership of the property also includes rights to the groundwater beneath the surface of the land.

### B.    Identities of the Defendants.

2.2    This action addresses the exposure of Plaintiff's property to PFAS in Washington that is attributable in whole or in part to AFFF commonly used for firefighting. Defendants 3M Company; AGC Chemicals Americas, Inc.; Amerex Corporation; Archroma U.S., Inc.; Arkema Inc.; BASF Corporation; Buckeye Fire Equipment Company ("Buckeye"); Carrier Fire & Security Americas Corporation ("Carrier Fire"); Carrier Global Corporation ("Carrier"); ChemDesign Products, Inc.; Chemguard, Inc.; Clariant Corporation; Dynax Corporation; EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("Old DuPont"); Kidde PLC, Inc.; National Foam, Inc.; The Chemours Company; and The Chemours Company FC, LLC; Tyco Fire

COMPLAINT FOR DAMAGES – 2

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Products LP (the foregoing collectively referred to as "Manufacturer Defendants")[1]; Corteva, Inc.; and DuPont de Nemours, Inc. f/k/a DowDuPont, Inc. ("New DuPont") (collectively with Manufacturer Defendants, "Defendants") have long understood the dangers of toxic PFAS, including but not limited to PFOS, PFOA, perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluorobutane sulfonic acid ("PFBS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA," known colloquially as "GenX").[2] Nevertheless, long after they became aware of these dangers, Defendants continued to advertise, market, manufacture for sale, offer for sale, and sell PFAS-containing AFFF and PFAS-containing fluorochemicals and fluorosurfactants[3] (collectively, "AFFF Products") to Washington agencies, counties, municipalities, local fire departments, businesses, other entities, and residents.

---

[1] Plaintiff has joined what he understands to be a substantial share of the market with regard to AFFF Product manufacturers and/or their corporate relatives.

[2] PFAS, as defined here, is not limited to the listed PFAS chemicals but also includes their neutral acid forms, anionic conjugate base forms, or neutral salt species as well as precursors that can degrade into PFOS, PFOA, PFHxS, PFNA, PFBS, HFPO-DA, and other perfluoroalkyl acids (a family of perfluorinated chemicals that consist of a carbon backbone and a charged functional moiety).

[3] Fluorochemicals, or fluorinated chemicals, are manmade organic compounds containing fluorine used in the manufacture of surfactants. Fluorosurfactants, or fluorinated surfactants, are synthetic organofluorine chemical compounds that have multiple fluorine atoms.

COMPLAINT FOR DAMAGES – 3

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

2.3     Defendant 3M Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. 3M has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Defendant 3M is registered to do business in Washington.

2.4     Defendant AGC Chemicals Americas, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed.

2.5     Defendant Amerex Corporation is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 2900 Highway 280 S, Suite 300, Birmingham, Alabama 35223. Amerex manufactures firefighting products. Beginning in 1971, it manufactured hand

COMPLAINT FOR DAMAGES – 4

portable and wheeled extinguishers for commercial and industrial application. Amerex has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Amerex is registered to do business in Washington.

2.6     Defendant Archroma U.S., Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 543577 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma U.S., Inc. a subsidiary of Archroma Management, LLC, has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. On information and belief, Archroma is a successor to Clariant, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

2.7     Defendant Arkema Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor-in-

COMPLAINT FOR DAMAGES – 5

interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Arkema is registered to do business in Washington.

2.8    Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor-in-interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation) and Ciba-Geigy, Inc. On information and belief, Ciba Inc. designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. BASF is registered to do business in Washington.

2.9    Defendant Buckeye Fire Equipment Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

COMPLAINT FOR DAMAGES – 6

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Buckeye has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed.

2.10 Defendant Carrier Fire & Security Americas Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.,[4] which is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier Fire is also the successor-in-interest to UTC Fire & Security Americas Corporation, Inc., following the spinoff transaction described in Paragraph 2.11. Carrier Fire, through Kidde/Kidde Fire, has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or

---

[4] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde-Fenwal, Inc.*, Case No. 23-10638-LSS (D. Del. Bankr.). On May 23, 2023, Kidde-Fenwal filed an adversary proceeding for declaratory and injunctive relief seeking to enjoin any filings against Kidde-Fenwal under the automatic stay provisions of the bankruptcy code. Out of an abundance of caution, Plaintiff chooses not to name Kidde-Fenwal as a defendant at this time.

COMPLAINT FOR DAMAGES – 7

disposed in Washington and to which Plaintiff's property was exposed. Carrier Fire is registered to do business in Washington.

2.11   Defendant Carrier Global Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reputable segments into Carrier, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement by and Among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier assumed certain liabilities, including those related to the business operated by Kidde/Kidde Fire. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier conducted business throughout the United States, including in Washington. Carrier, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in Washington, to which Plaintiff's property was exposed.

2.12   Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143. On information and

COMPLAINT FOR DAMAGES – 8

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

belief, ChemDesign designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF, primarily to Chemguard Inc., that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed.

2.13    Defendant Chemguard, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Upon information and belief, Chemguard is a subsidiary of Johnson Controls International PLC. Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Chemguard has also designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Chemguard is registered to do business in Washington.

2.14    Defendant Clariant Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business located

COMPLAINT FOR DAMAGES – 9

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Clariant is registered to do business in Washington.

2.15   Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. Corteva is registered to do business in Washington.

2.16   Defendant DuPont de Nemours, Inc. (i.e., New DuPont), formerly known as DowDuPont Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic assets and liabilities to

COMPLAINT FOR DAMAGES – 10

other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in Washington.

2.17    Defendant Dynax Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed.

2.18    Defendant EIDP, Inc. (i.e., Old DuPont), f/k/a E.I. du Pont de Nemours and Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and/or fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Old DuPont is registered to do business in Washington.

2.19    Old DuPont is a successor-in-interest to DuPont Chemical Solutions

COMPLAINT FOR DAMAGES – 11

Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19898. DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis. In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, Old DuPont provided its Telomer-based sales products in the United States for the year 2002. The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.

2.20   Defendant Kidde PLC, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Nine Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC was part of United Technologies Corporation. At all relevant times, Kidde PLC conducted business throughout the United States, including in Washington. Kidde PLC, directly and through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in Washington, to which Plaintiff's property was exposed.

COMPLAINT FOR DAMAGES – 12

2.21    Defendant National Foam, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382. Upon information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam/Angus Fire has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed.

2.22    Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries arising from the manufacture and sale of fluorochemicals and the products that contain them.

COMPLAINT FOR DAMAGES – 13

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Chemours has designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Chemours is registered to do business in Washington.

2.23    Defendant The Chemours Company FC, LLC ("Chemours FC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a successor-in-interest to DuPont Chemical. Chemours FC designed, developed, manufactured, marketed, and/or sold the AFFF or fluorochemical products containing PFAS used by firefighters throughout the United States, including in Washington, and to which Plaintiff's property was exposed.

2.24    Defendant Tyco Fire Products LP is a limited partnership organized under the laws of the State of Pennsylvania, with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Upon information and belief, Tyco is a subsidiary of Johnson Controls International PLC. Tyco manufactures the Ansul brand of products and is the successor-in-interest to The Ansul Company (together, "Tyco/Ansul"), having acquired Ansul in 1990. Tyco/Ansul has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing AFFF that was transported, stored, used, handled, trained with,

COMPLAINT FOR DAMAGES – 14

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Tyco/Ansul has also designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Washington and to which Plaintiff's property was exposed. Tyco is registered to do business in Washington. Upon information and belief, Tyco also acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

## III.    JURISDICTION AND VENUE

### A.    The Eastern District of Washington has jurisdiction.

3.1    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

3.2    This Court has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the State of

COMPLAINT FOR DAMAGES – 15

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Washington for such use as would cause harm to the property of residents like Plaintiff. Therefore, the exercise of jurisdiction over the Defendants by this Court does not offend traditional notions of fair play and substantial justice.

**B.    Venue is proper in the Eastern District of Washington.**

3.3     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions by Defendants giving rise to the claims asserted herein occurred in the Eastern District of Washington and caused harm to Plaintiff, who resides in this District.

**IV.    FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING**

**A.    AFFF is harmful to human health, animals, and the environment.**

4.1     AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, vehicle fires, train derailments, and chemical fires, and has been used routinely to train firefighters and test firefighting equipment.

4.2     AFFF Products contain PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms.

4.3     The PFAS family, including but not limited to PFOS, PFOA, PFHxS, PFNA, PFBS, and HFPO-DA, can cause extensive and long-lasting environmental

COMPLAINT FOR DAMAGES – 16

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

contamination.

4.4     The carbon-fluorine bond is one of the strongest bonds in chemistry and gives PFAS their unique chemical properties. The carbon-fluorine bond in PFAS is human made and generally does not occur in nature.

4.5     On information and belief, AFFF Products have been used and/or stored in Washington at local, state, and regional fire training centers; at federal military installations; at the State's five oil refineries; at other petroleum facilities (such as blending facilities, loading and fueling terminals, and other flammable liquid storage); in highway tunnels; on merchant ships and oil cargo tankers; and at various facilities for oil spill response.

4.6     Defendants' intended use of AFFF for, *inter alia*, emergency response, firefighting equipment testing, emergency activation of fire suppression systems, and training exercises can release hundreds, if not thousands, of gallons of foamy water laced with PFAS. These releases have occurred, *inter alia*, at federal military installations, public properties, fire departments, airports, petroleum facilities and refineries, train derailment sites, bulk storage terminals, industrial facilities and other facilities handling large volumes of flammable liquid hydrocarbons, and on merchant ships and oil cargo tankers. Millions more gallons of water contaminated with PFAS from AFFF Products have been released in Washington as a result of additional spills and may be released in certain emergency situations. Due to these releases, PFAS

COMPLAINT FOR DAMAGES – 17

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

from AFFF Products have been and continue to be released into the environment in a variety of ways, including but not limited to, through soils, sediment, surface water, and groundwater.

4.7    For example, from at least the 1970s to 1991, Fairchild Air Force Base had fire training exercises two to three times per month. Approximately 125 gallons of AFFF were used during each training exercise.

4.8    PFAS are mobile and persistent in the environment. By design, they withstand high temperatures and survive highly corrosive environments. Once introduced into the environment, PFAS quickly spread because they easily dissolve in water and, thus, have reached numerous water systems within the State. Many PFAS—such as those used for firefighting foam—degrade in the environment to form perfluoroalkyl acids that are not broken down by any known natural mechanism and are thus extraordinarily costly to clean up. Similarly, removal of PFAS from drinking water sources requires specialized, and expensive, drinking water treatment systems. In short, once PFAS are used, they migrate through the environment; ultimately resist natural degradation; contaminate natural resources, including drinking water; and are difficult and costly to remove. With no known natural processes capable of destroying PFAS, the toxic and hazardous effects of PFAS will impact Washington for decades, if not centuries.

4.9    PFAS are toxic and cause significant adverse effects to human health.

COMPLAINT FOR DAMAGES – 18

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

The presence of these chemicals in drinking water and other natural resources presents a serious threat to public health. This threat is so serious that for PFOA and PFOS, two of the most well studied PFAS, the U.S. Environmental Protection Agency (EPA) recently proposed a rule under the federal Safe Drinking Water Act to set the health-based Maximum Contaminant Level Goal for PFOA and PFOS in drinking water to zero because "there is no dose below which either chemical is considered safe." Depending on the individual PFAS, exposure to PFAS has been linked to numerous adverse health effects, including but not limited to kidney cancer; testicular cancer; ulcerative colitis; thyroid disease; medically diagnosed high cholesterol; pregnancy induced hypertension and preeclampsia; negative impacts on reproduction, liver, thyroid, immune function, and fetal growth and development; and increased risk of cardiovascular disease, liver disease, and liver cancer.

4.10  Some PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because humans and some other organisms slowly excrete certain PFAS, ongoing low-level exposure results in a buildup in body burden (*i.e.*, levels of PFAS remaining within the body). PFAS also can biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain. PFAS also are harmful to the environment and animal health and can build up in sediments and soils over time, impacting plants, fish, and animals.

4.11  These persistent "forever chemicals" have caused and will continue to

COMPLAINT FOR DAMAGES – 19

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

cause long-lasting contamination in Washington that adversely impacts human health and the environment.

**B.     Manufacturer Defendants have manufactured and sold AFFF products for decades.**

4.12   3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

4.13   3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

4.14   Arkema's predecessors supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spinoff from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

COMPLAINT FOR DAMAGES – 20

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

4.15   At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

4.16   From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

4.17   In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF.

4.18   After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to grab a share of the AFFF market when 3M exited, although Old DuPont had decades of evidence that PFAS were highly toxic and dangerous to the environment and human health.

4.19   3M manufactured its AFFF Products through an electrochemical fluorination process that makes it possible in some situations to "fingerprint" the PFAS that originated in 3M products. The remaining Manufacturer Defendants' AFFF Products were created using a telomerization process and contain or break down into PFOA. AFFF Products manufactured by Manufacturer Defendants other than 3M are fungible and lack traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant. Even with respect to 3M's AFFF Products, transformation in the environment makes these products difficult to attribute solely to 3M. Due to this

COMPLAINT FOR DAMAGES – 21

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

fungibility, Manufacturer Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site. Any inability of Plaintiff to identify the original manufacturer of the specific AFFF Products released onto Plaintiff's property is a result of the fungibility of the products.

**C.    Manufacturer Defendants knew, or should have known, that their AFFF products containing PFAS were harmful to the environment and human health.**

**1.    *3M knew, or should have known, of the harm caused by PFAS, and 3M suppressed negative information about these chemicals.***

4.20    3M has known for decades that the PFAS contained in its AFFF are toxic and adversely affect the environment and human health.

4.21    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

4.22    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

4.23    As early as 1963, 3M knew that PFAS were highly stable in the environment and did not degrade after disposal.

4.24    By the 1970s, 3M had become concerned about the risks posed to the

COMPLAINT FOR DAMAGES – 22

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

general population by exposure to 3M's fluorochemicals.

4.25   By no later than 1970, 3M knew that PFAS were hazardous to marine life. Still, 3M refused to take any steps to mitigate these hazards. In fact, around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

4.26   In 1975, 3M found there was a "universal presence" of PFAS (PFOA and/or PFOS) in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS, a scenario 3M discussed internally but did not share outside the company. The presence of PFAS in human blood serum also alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying.

4.27   As early as 1976, 3M began monitoring the blood of its employees for PFAS based on its concerns about the health effects of PFAS.

4.28   In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. Every monkey died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the livers and gastrointestinal tracts of the species tested.

4.29   In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew

COMPLAINT FOR DAMAGES – 23

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

a direct line between effluent from 3M's plant in Decatur, Alabama and fluorochemicals bioaccumulating in the tissue of fish taken from the Tennessee River adjacent to the 3M plant.

4.30   According to a 3M environmental specialist, Dr. Richard Purdy, who resigned due to the company's inaction over PFOS's environmental impacts, 3M had been resisting calls from its own ecotoxicologists since 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of Dr. Purdy's resignation in 1999, 3M continued its resistance.

4.31   In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

4.32   In 1984, 3M's internal analyses proved that fluorochemicals were likely bioaccumulating in 3M's employees.

4.33   Despite its understanding of the hazards associated with the PFAS in its products, 3M suppressed scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

4.34   At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

COMPLAINT FOR DAMAGES – 24

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA  98101
(206) 501-4446

4.35    Thus, 3M deceived others and hid the negative effects of PFAS. When he resigned, Dr. Purdy wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its PFOS; (2) 3M's submission of misinformation about its PFOS to EPA; (3) 3M's failure to disclose substantial risks associated with its PFOS to EPA; (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

4.36    Dr. Purdy described PFOS as "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

4.37    By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 parts per billion, at a time when 3M was well aware that the average level of PFOS being found in the blood of the general population of the United States was approximately 30 times higher than this "safe" blood level, but 3M did not disclose that information to regulatory authorities or the public.

COMPLAINT FOR DAMAGES – 25

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.38   Despite its knowledge of the risks associated with exposures to PFAS, when 3M announced it would phase out its PFOS, PFOA, and related products (including AFFF) in 2000, it falsely asserted that "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA. In its press release announcing the phase-out, 3M stated that its decision was "based on [its] principles of responsible environmental management" and that "the presence of these materials at very low levels does not pose a human health or environmental risk." In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention."

4.39   3M knew or should have known, that its AFFF, in its intended use, would release PFAS that would dissolve in water; reach Washington's water systems and natural resources; resist degradation; bioaccumulate and biomagnify; and harm human, ecological, and animal health in Washington due to their toxicity adversely affecting Washington residents such as Plaintiff. Such knowledge was accessible to 3M, but not to Plaintiff.

**2.   *Old DuPont knew, or should have known, of the harms caused by PFAS, and it concealed its knowledge from regulators and user of AFFF products.***

4.40   Old DuPont began using PFOA and other PFAS in its specialty chemical

COMPLAINT FOR DAMAGES – 26

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

productions applications in the 1950s and, quickly thereafter, developed an understanding of the dangers of using these chemicals.

4.41   During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon, which was manufactured using PFOA and/or other PFAS, and related industrial facilities emitted and discharged PFOA and/or other PFAS in large quantities into the environment and that many people had been exposed to its PFAS, including via public and private drinking water supplies.

4.42   Old DuPont scientists issued internal warnings about the toxicity associated with PFOA as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

4.43   In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

4.44   By 1979, Old DuPont had data indicating that, not only was organic

COMPLAINT FOR DAMAGES – 27

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but that those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State, at that time.

4.45   The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

4.46   Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with Teflon, two—or 25 percent—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

4.47   Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own workers.

4.48   Not only did Old DuPont know about PFOA's toxicity as early as the 1960s, it was also aware that PFAS was capable of contaminating the surrounding environment, leading to human exposure. For example, no later than 1984, Old

COMPLAINT FOR DAMAGES – 28

DuPont was aware that PFOA released from its manufacturing operations was contaminating local drinking water supplies, but said nothing to regulators or the affected communities.

4.49   Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware in 1984 to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position." Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment.

4.50   In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA,

COMPLAINT FOR DAMAGES – 29

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

in violation of the federal Toxic Substances Control Act and Resource Conservation and Recovery Act. Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

4.51    Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

4.52    Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, only began to sell AFFF Products after 3M announced its phase out of PFOA and PFOS in 2000 (due to 3M's knowledge of the compounds' toxicity and threats of further enforcement action by EPA). In 2008, an Industrial Fire World magazine article regarding AFFF quoted Old DuPont literature, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

COMPLAINT FOR DAMAGES – 30

Old DuPont knew these statements were not true, but did not correct them.

4.53   Old DuPont knew, or should have known, that its PFAS would spread through water; reach Washington's water systems and natural resources; resist degradation; bioaccumulate and biomagnify; and harm human, ecological, and animal health in Washington due to their toxicity, affecting Washington residents such as Plaintiff. Such knowledge was accessible to Old DuPont, but not to Plaintiff.

3.      ***The Remaining Manufacturer Defendants knew, or should have known, of the harm caused by the release of PFOA from their AFFF products.***

4.54   The remaining Manufacturer Defendants knew, or should have known, that in their intended and/or common use, their AFFF Products containing PFAS would harm the environment and human health.

4.55   Information regarding PFAS was readily accessible to each of the remaining Manufacturer Defendants for decades because each is an expert in the field of AFFF Products' manufacture and/or the PFAS-containing materials needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. Plaintiff, by contrast, did not have access to such information.

4.56   The remaining Manufacturer Defendants knew, or should have known, that their AFFF Products released PFAS that would spread through water; reach

COMPLAINT FOR DAMAGES – 31

Washington's water systems and natural resources; resist degradation; bioaccumulate and biomagnify; and harm human, ecological, and animal health in Washington due to their toxicity adversely affecting Washington residents such as Plaintiff.

### 4. *Manufacturer Defendants worked together through the Firefighting Foam Coalition to protect AFFF products from scrutiny.*

4.57   The Firefighting Foam Coalition (FFFC), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. National Foam, Kidde PLC, Inc., Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Members") were members of the FFFC, as were others in the industry. Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors released from AFFF Products but did not share that information with the general public, AFFF Product customers, or government entities, including Washington State.

4.58   FFFC Members worked together to protect AFFF Products from scrutiny by, among other things, coordinating their messaging on PFOA's toxicological profile and on their AFFF Products' contribution of PFOA into the environment. All of this was done as part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities' learning the truth about the harms of PFOA to the environment and human

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

health. FFFC Members regularly published newsletters promoting their AFFF Products, while also regularly attending trade group conferences to disseminate misleading messaging.

4.59   FFFC Members' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal from the general public and government entities, including Washington State, the known risks of their AFFF Products.

4.60   FFFC Members repeated the same messaging for years with the result that only one PFAS chemical—PFOS, which FFFC Members' products did not contain—was taken off the market.

4.61   FFFC Members knew, however, that their messaging regarding their AFFF Products was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF Products and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities because FFFC Members would not share their knowledge about the dangers of PFAS and their AFFF Products.

**D.   Manufacturer Defendants made affirmative misrepresentations and material omissions in their marketing of AFFF products.**

COMPLAINT FOR DAMAGES – 33

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

4.62    Manufacturer Defendants marketed, promoted, offered for sale, sold, and distributed AFFF Products to entities in Washington for use in Washington, including but not limited to Washington agencies, counties, municipalities, local fire departments, businesses, other entities, and residents. Manufacturer Defendants knowingly sold their AFFF Products to end users within Washington and delivered their AFFF Products into the AFFF market with the expectation that they would be purchased by consumers in Washington.

4.63    Manufacturer Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Manufacturer Defendants marketed their AFFF Products by promoting their long shelf life. Even after Manufacturer Defendants fully understood the toxicity of PFAS—and their injurious impacts when released into the environment through use of AFFF Products exactly as they had marketed and intended for them to be used—Manufacturer Defendants concealed the truth harmful nature of PFAS. Even while Manufacturer Defendants phased out production or transitioned to other formulas, they did not advise their customers that they should not use AFFF Products that contained PFAS, did not issue a recall, and did not otherwise reveal the dangers posed by the AFFF Products. Manufacturer Defendants further did not attempt to remove their harmful products from the market. Manufacturer Defendants did not warn the State or others that the use of AFFF Products with PFAS would harm the environment, endanger human health, or result

COMPLAINT FOR DAMAGES – 34

in substantial costs to investigate and clean up groundwater contamination and damage to other natural resources.

4.64 Accordingly, for many years after their original sale, AFFF Products were still being applied directly to the ground and washed into Washington's waters, sediments, and soils, endangering human health, and harming the environment. Manufacturer Defendants never advised their customers that they needed to properly dispose of their stockpiles of AFFF Products, and they did not advise them on how to properly dispose of AFFF Products.

4.65 In product descriptions and marketing materials distributed to purchasers of their AFFF Products, Manufacturer Defendants made affirmative misrepresentations about their products, including but not limited to: (1) their products were biodegradable and/or "environmentally neutral"; (2) their products were nontoxic; (3) their products were not bioaccumulative; (4) their products were not persistent; (5) their products could be disposed of in conventional wastewater treatment systems or poured down the drain; (6) their products were appropriate for use for training purposes; (7) their telomer-based AFFF Products were safe in contrast to AFFF Products manufactured using electrochemical fluorination processes; and (8) their products purportedly produced pursuant to military specifications were appropriate for use in civilian applications.

4.66 In product descriptions and marketing materials, Manufacturer

COMPLAINT FOR DAMAGES – 35

Defendants omitted material information including, but not limited to: (1) failing to disclose the persistent, bioaccumulative, and toxic nature of PFAS contained in AFFF Products; (2) failing to disclose that their AFFF Products contained PFAS; and (3) failing to disclose how to safely clean up and dispose of AFFF Products.

4.67   Acting for commercial gain, Manufacturer Defendants manipulated, obfuscated, and failed to disclose scientific studies and results relating to the persistence, bioaccumulation, and toxicity of their AFFF Products. Manufacturer Defendants sought to create a deceptive net impression that their AFFF Products were safer than they were and thereby delay the development of safe or safer alternatives to AFFF Products for civilian use.

**E.    PFAS from AFFF harmed Plaintiff's property.**

**1.    *The Contamination of Medical Lake, WA.***

4.68   Fairchild Airforce Base ("Fairchild AFB") is located approximately 12 miles west of Spokane, Washington. It contains a fire training site, as well as several historic firefighting training sites.

4.69   The United States Air Force ("USAF") has conducted firefighting training exercises on Fairchild AFB from the 1970s to today.

4.70   As part of firefighting training exercises, Fairchild AFB, like many other U.S. military bases, has used AFFF and other materials containing PFAS.

4.71   AFFF has been linked to the contamination of surface and groundwater

COMPLAINT FOR DAMAGES – 36

with PFAS throughout the country.

4.72   The city of Medical Lake, Washington, is nearby and downgradient of Fairchild AFB and has widespread contamination in its water supply as the result of AFFF used at Fairchild AFB.

4.73   Residents of Medical Lake receive their potable water either from private wells or from their municipal water provider.

4.74   PFAS that originated and was released from Fairchild AFB have contaminated numerous private and public wells relied upon by these residents, including Plaintiff.

4.75   PFOA and PFOS have been detected in levels exceeding the current EPA Health Advisory Limit of 70 parts per trillion (ppt) in both municipal and private wells that provide water to Medical Lake.

4.76   Investigations have concluded that the basis for this widespread contamination of the groundwater is decades of use, storage, and disposal of AFFF at Fairchild AFB that contained PFAS.

4.77   Several studies and assessments conducted by HydroGeoLogic, Inc. ("HGL"), CH2M Hill ("CH2M"), the United States Air Force, the Environmental Protection Agency's Office of Water ("EPAOW"), Amec Foster Wheeler ("AFW"), and the Washington State Department of Ecology ("WSDE") all confirmed the existence of widespread PFAS contamination of the groundwater resources for

COMPLAINT FOR DAMAGES – 37

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

Medical Lake.[5]

4.78   Prior investigations by the USAF and WSDE also concluded that decades of use, storage, and disposal of AFFF at Fairchild AFB caused the PFOA and PFOS contamination of groundwater in the surrounding communities, including contaminating the municipal water system and private wells serving Medical Lake.[6]

4.79   Defendants manufactured and distributed the AFFF to Fairchild AFB, knowing that AFFF containing PFAS presented an unreasonable risk to human health and the environment and was inherently dangerous.

4.80   Defendants also knew that PFAS were highly soluble and mobile in water, highly likely to contaminate water supplies and other sensitive receptors, were persistent in the environment, and would bio-accumulate in humans causing serious health effects.

4.81   Defendants marketed and sold their products with knowledge that large quantities of AFFF, containing toxic PFAS, would be used in training exercises and in emergency situations at military bases, including Fairchild AFB, in such a manner

[5] U.S. Air Force Engineering Center, Fairchild Air Force Base, Washington. *Action Memorandum for a Time-Critical Removal Action Treatment of PFOS- and PFOA- Contaminated Water In Residential Wells Near Fairchild Air Force Base, Washington.* Oct 2017.

[6] Fairchild Air Force Base Washington. *Fairchild AFB Washington Administrative Record File Number 219*. Sep. 1989.

COMPLAINT FOR DAMAGES – 38

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

that PFAS would contaminate the air, soil, and groundwater.

4.82   Defendants marketed and sold their products with knowledge that large quantities of AFFF, containing toxic PFAS, would be stored in fire suppressant systems and tanks on USAF Bases, including Fairchild AFB, and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the air, soil, and groundwater.

4.83   Defendants failed in their duty to warn users, bystanders, and sensitive receptors of the inherently dangerous properties of their AFFF.

### 2.     *Health Effects of PFOS and PFOA Exposure.*

4.84   Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

4.85   The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

4.86   Health effects of PFOS are the same as PFOA.

4.87   In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of

COMPLAINT FOR DAMAGES – 39

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[7]

4.88   The USEPA's Lifetime Health Advisory and Health Effects of 70 ppt, set in May 2016, was an attempt to identify the concentration of PFOA and/or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.[8]

4.89   Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

4.90   California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and

---

[7] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ. Health Perspect. 123:A107– A111; http://dx.doi.org/10.1289/ehp.1509934.

[8] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

COMPLAINT FOR DAMAGES – 40

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

Toxic Enforcement Act of 1986.

4.91   The United States Senate and House of Representatives passed the National Defense Authorization Act in November, 2017, which included $42 Million to remediate PFAS contamination from military bases, as well as devoting $7 Million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

4.92   Washington currently follows the USEPA level of 70 ppt for combined PFOA and PFOS levels.

**3.     *Contamination and Harm to Plaintiff's Property.***

4.93   In 2024, Plaintiff contacted the city of Medical Lake for the purpose of selling water on his property to the city. In response, on April 2, 2024, the city sent a hydrologist, Dr. Chad Pritchard to test the water on Plaintiff's property.

4.94   Dr. Pritchard's testing found that Plaintiff's water was contaminated with PFAS far in excess of acceptable limits.

4.95   Dr. Pritchard continued to test Plaintiff's water, and his results show that the PFAS contamination is increasing.

4.96   As a result of these PFAS test results, Medical Lake chose not to proceed with purchasing any water from Plaintiff.

4.97   In approximately 2022, Plaintiff started a fish farm on his property

COMPLAINT FOR DAMAGES – 41

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

raising rainbow trout.

4.98   As of April 2024, when Plaintiff received the first test results showing PFAS contamination in his water, the first generation of fish raised on the farm were almost at the point of being ready for sale.

4.99   As a result of these PFAS test results, Plaintiff was unable to sell any of the fish raised on his fish farm. In total, Plaintiff lost thousands of fish he could not sell. Plaintiff's loss is not limited to the fish themselves, but also the resources in time, money, and labor invested into the fish farm.

4.100 Removing the PFAS contamination from Plaintiff's property requires extensive and expensive remediation.

4.101 The value of Plaintiff's property has diminished as a result of the PFAS contamination.

4.102 In this and other ways, Plaintiff has been injured as a result of his property being contaminated with PFAS.

**F.     Old DuPont undertook a multi-step, years-long fraudulent scheme to isolate its valuable tangible assets from its PFAS liabilities and hinder creditors.**

4.103 Beginning in or about 2013 and continuing through at least June 2019, Old DuPont planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities—especially those arising from PFAS contamination.

COMPLAINT FOR DAMAGES – 42

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.104 Old DuPont's potential cumulative liability related to PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

4.105 For more than five decades, Old DuPont manufactured, produced, or utilized PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFAS was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFAS in large quantities into the environment and that many people had been exposed to PFAS, including through public and private drinking water supplies, like those in Washington, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including PFAS-containing AFFF.

4.106 Beginning in at least 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production, and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

4.107 Old DuPont's in-house counsel were very concerned about Old

COMPLAINT FOR DAMAGES – 43

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

DuPont's exposure to liability related to PFAS. In November 2000, one of Old DuPont's in-house lawyers handling PFAS issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

4.108 In 2005, after settling the Tennant case, Old DuPont settled the claims brought by EPA for violations of the Toxic Substances Control Act and Resource Conservation and Recovery Act related to its failure to disclose toxicity and exposure information for PFOA, as discussed in Paragraph 4.50.

4.109 Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

4.110 Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the Science Panel) to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235

COMPLAINT FOR DAMAGES – 44

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could have caused each of the linked diseases.

4.111 By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, preeclampsia, thyroid disease, testicular cancer, and kidney cancer.

4.112 After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio (Ohio MDL). Forty bellwether trials were scheduled to take place in 2015 and 2016.

4.113 The first three trials in the Ohio MDL ended in plaintiffs' verdicts. Each jury awarded damages in a larger amount than the one before it—the first

COMPLAINT FOR DAMAGES – 45

awarded $1.6 million, the second awarded $5.6 million, and the third awarded $12.5 million. The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million dollars.

4.114 Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as the liability related to PFAS contamination caused by its manufacturing operations at other sites throughout the country and globally and that its liability likely measured in the billions of dollars.

4.115 Anticipating this significant liability exposure, Old DuPont had convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

4.116 In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company (Old Dow) began to discuss a possible "merger of equals" in or about 2013.

4.117 However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

4.118 Accordingly, Old DuPont's management decided to pursue a

COMPLAINT FOR DAMAGES – 46

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

multiyear corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

4.119 Old DuPont engaged in a coordinated three-part restructuring plan that consisted of: (1) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company; (2) the creation of New DuPont to facilitate a purported merger with Old Dow; and (3) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

4.120 The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. Then, in July 2015, Old DuPont "spun off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities ("the Chemours Spinoff").

4.121 Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

COMPLAINT FOR DAMAGES – 47

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.122 The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

4.123 In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

4.124 Those realignments and divestitures culminated in DowDuPont spinning off two new publicly traded companies: (1) Corteva, which currently holds Old DuPont as a subsidiary, and (2) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., "New DuPont").

4.125 Old DuPont's restructuring—beginning with the spinoff of Chemours in 2015, and ending with the spinoff of Corteva in 2019—was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

4.126 As a result of this restructuring, between December 2014 (*i.e.*, before the Chemours Spinoff) and December 2019 (i.e., after the Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately

COMPLAINT FOR DAMAGES – 48

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

one-half.

4.127 New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

4.128 Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

4.129 The below graphic depicts the restructuring as it progressed through each of the three steps:



4.130 In greater detail, the restructuring scheme was implemented as

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

follows.

### 1.    *Step 1: The Chemours spinoff.*

4.131 In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

4.132 On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

4.133 On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

4.134 At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFAS into the environment.

4.135 Prior to the Chemours Spinoff, Chemours's Board of Directors was dominated by Old DuPont employees.

4.136 As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

4.137 To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement ("the Chemours Separation Agreement").

COMPLAINT FOR DAMAGES – 50

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.138 Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

4.139 At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

4.140 Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

4.141 Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. On May 12, 2015, Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share

COMPLAINT FOR DAMAGES – 51

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

price).

4.142 Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of Plaintiff, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours. In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

4.143 Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFAS, into the environment from its dozens of facilities.

4.144 Under the Chemours Separation Agreement, Chemours must

COMPLAINT FOR DAMAGES – 52

indemnify Old DuPont against and assume for itself the Chemours Liabilities regardless of: (1) when or where such liabilities arose; (2) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spinoff; (3) where or against whom such liabilities are asserted or determined; (4) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (5) the accuracy of the maximum probable loss values assigned to such liabilities; and (6) which entity is named in any action associated with any liability.

4.145 The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

4.146 In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

4.147 The Chemours Spinoff was so one-sided that, in May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.,* C.A. No. 2019-0351

COMPLAINT FOR DAMAGES – 53

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

(Del. Ch. Ct., filed May 13, 2019).

4.148 In its Amended Complaint—which was verified by Chemours's current Chief Executive Officer, Mark Newman—Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

4.149 Chemours also alleged, among other things, that if (1) the full value of Old DuPont's PFAS and environmental liabilities was properly estimated and (2) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

4.150 There was no meaningful, arm's-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

4.151 In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all of the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of the commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

COMPLAINT FOR DAMAGES – 54

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

4.152 Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as PFAS-containing AFFF, and in so doing, shield Old DuPont.

4.153 Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission (SEC) that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

4.154 Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

4.155 At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

4.156 For the year 2015, Chemours reported $454 million in "other accrued

COMPLAINT FOR DAMAGES – 55

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

4.157 Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont's and Chemours's facilities.

4.158 For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the Ohio MDL brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

4.159 Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

COMPLAINT FOR DAMAGES – 56

### 2. *Step 2: The Old Dow/Old DuPont "merger."*

4.160 After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

4.161 Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

4.162 Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

4.163 On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("the DowDuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

4.164 To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger ("the DowDuPont Merger Agreement") that

COMPLAINT FOR DAMAGES – 57

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

provided for (1) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (i.e., New DuPont), and (2) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

4.165 Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

4.166 Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

4.167 The corporate organization following the "merger" is depicted under "Step 2" in the graphic in Paragraph 4.129.

### 3. *Step 3: The shuffling, reorganization, and transfer of valuable assets away from Old DuPont and separation of Corteva and New Dow.*

4.168 Following the DowDuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these

COMPLAINT FOR DAMAGES – 58

transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

4.169 It is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

4.170 Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (1) the "Agriculture Business," (2) the "Specialty Products Business," and (3) the "Materials Science Business."

4.171 While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

4.172 Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (1) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (2)

COMPLAINT FOR DAMAGES – 59

New Dow, which became the parent holding company of Old Dow and holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

4.173 The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



4.174 The mechanics of the separations are governed by the April 1, 2019

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont ("the DowDuPont Separation Agreement").

4.175 The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

4.176 Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to their respective business divisions: (1) Corteva retained and assumed the liabilities related to the Agriculture Business; (2) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (3) New Dow retained and assumed the liabilities related to the Materials Science Business.

4.177 Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

4.178 This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the

COMPLAINT FOR DAMAGES – 61

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

State's claims in this case.

4.179 While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to Plaintiff's property.

4.180 The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

4.181 DowDuPont then consolidated the Agricultural Business line into Old DuPont, and "contributed" Old DuPont to Corteva.

4.182 On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

4.183 Corteva now holds 100 percent of the outstanding common stock of Old DuPont.

4.184 The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in "Step 3" of the graphic in Paragraph 4.129.

COMPLAINT FOR DAMAGES – 62

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.185 Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

4.186 On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**G.    Old DuPont, Chemours, New DuPont, and Corteva's years-long conspiracy to defraud their creditors has stripped away valuable assets otherwise available to satisfy Old DuPont's legacy liabilities.**

4.187 The net result of these transactions, including the June 1, 2019, Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

4.188 Old DuPont estimated that the DowDuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

4.189 In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

4.190 For example, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128 percent in net income and a decrease of 73 percent in annual operating cash flow.

4.191 Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

4.192 Also, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the 2019 fiscal year, Old DuPont owned just under $21 billion in tangible assets.

4.193 That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

4.194 As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were

COMPLAINT FOR DAMAGES – 64

composed of intangible assets, including "goodwill" from its successive restructuring activities.

4.195 At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

4.196 In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

4.197 Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value, and is in the process of divesting more.

4.198 Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

4.199 The Chemours Spinoff, the DowDuPont Merger, and the final separation of Corteva were part of a single coordinated fraudulent scheme to

COMPLAINT FOR DAMAGES – 65

FRIEDMAN | RUBIN PLLP
1109 First Avenue, Suite 501
Seattle WA 98101
(206) 501-4446

hinder, delay, and defraud Old DuPont's creditors. The Chemours Spinoff constitutes a fraudulent transfer, which entitles Plaintiff to, among other things, void the transaction and recover property or value transferred from Chemours in the transaction. The DowDuPont Merger and separation of Corteva from New DuPont likewise constitute a fraudulent transfer that entitles Plaintiff to, among other things, recover property and value transferred to New DuPont and Corteva.

## V.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (ALL DEFENDANTS)

5.1    Plaintiff incorporates and reaffirms the preceding paragraphs.

5.2    Plaintiff brings this claim under the common law.

5.3    Under Washington law, a cause of action arises for negligence when a defendant: (1) owes a duty to a plaintiff; (2) breaches that duty; and (3) proximately causes the resulting injury.

5.4    Manufacturer Defendants owed a duty of care to Plaintiff, including but not limited to the duty to exercise reasonable care in the research, design, formulation, handling, manufacture, marketing, sale, testing, labeling, use, distribution, promotion, and/or instructions for use of their AFFF Products containing PFAS. This includes a duty to warn of the hazards associated with AFFF, containing PFAS, entering and poisoning the environment and groundwater, even after the product was

COMPLAINT FOR DAMAGES – 66

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

manufactured and sold.

5.5     Manufacturer Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

5.6     Manufacturer Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

5.7     Manufacturer Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFAS, was hazardous to the environment and to human health. This includes marketing and selling their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and in emergency situations at military bases, including Fairchild AFB, in such a manner that dangerous chemicals would be released into the environment.

5.8     Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored in fire suppressant systems and tanks on USAF Bases and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

5.9     Manufacturer Defendants knew or should have known that use of AFFF Products would result in the release of PFAS into the environment, including in

COMPLAINT FOR DAMAGES – 67

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Washington, and injure Plaintiff by contaminating his real property, including both the water supply and the land itself, with PFAS.

5.10   Knowing of the dangerous and hazardous properties of AFFF, and the manner in which AFFF would be used, stored, and maintained at places like Fairchild AFB, it was foreseeable that AFFF would contaminate the surrounding environment, groundwater, and drinking water supplies in and around Medical Lake, WA, as a result of this city's proximity to Fairchild AFB.

5.11   Manufacturer Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFAS into the surrounding environment, groundwater, and drinking water supplies.

5.12   The magnitude of the burden on the Manufacturer Defendants to guard against this foreseeable harm to Plaintiff was minimal, as the practical consequences of placing this burden on the Manufacturer Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF Products.

5.13   Manufacturer Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF Products.

5.14   Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on the Manufacturer Defendants, the Manufacturer Defendants

COMPLAINT FOR DAMAGES – 68

therefore owed a cognizable duty of reasonable care to Plaintiff.

5.15   By failing to disclose the dangers to human health and the environment associated with PFAS, failing to provide reasonable warnings or special instructions, failing to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresenting the hazards of PFAS in their AFFF Product information and/or instructions for use, Manufacturer Defendants breached their duty of care to Plaintiff.

5.16   Manufacturer Defendants' acts and omissions directly and proximately caused injury to Plaintiff and his property.

5.17   As a direct and proximate result of Manufacturer Defendants' acts and omissions, Plaintiff has incurred, is incurring, and will continue to incur in the future damages related to PFAS contamination. These damages include, but are not limited to, the diminishment of the value and marketability of Plaintiff's property, the cost of remediation and/or mitigation systems for his property, the cost of alternative water, the loss of the use and enjoyment of his property, and annoyance, discomfort, and inconvenience suffered as a consequence of the contamination of his property.

5.18   As described above, Corteva and New DuPont assumed Old DuPont's negligence liability.

5.19   Manufacturer Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

COMPLAINT FOR DAMAGES – 69

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

## COUNT II
## PRODUCTS LIABILITY, DESIGN DEFECT – RCW 7.72 & COMMON LAW
## (ALL DEFENDANTS)

5.20   Plaintiff incorporates and reaffirms the preceding paragraphs.

5.21   Plaintiff brings this claim under the Washington Product Liability Act (WPLA), Chapter 7.72 RCW, and the common law.

5.22   Under the WPLA, "[a] product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030(1)(a).

5.23   Under Washington common law, a claim arises if: (1) the defendant's products were defectively designed; (2) the defect existed at the time the products left the defendant's control; (3) the defect was not known to the user; (4) the defect rendered the products unreasonably dangerous for their intended use; and (5) the design defect proximately caused the plaintiff's injury.

5.24   Manufacturer Defendants' AFFF Products were not reasonably safe as designed because, at the time of manufacture, the likelihood that AFFF Products would cause harm—including but not limited to significant and pervasive contamination of Washington's land and water supplies, including

COMPLAINT FOR DAMAGES – 70

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Plaintiff's land and water supply, that threatens human health and the environment—outweighed the burden on the Manufacturing Defendants to design a product that would have prevented such harm and the adverse effect that a practical and feasible alternative design would have on the usefulness of AFFF Products.

5.25   Despite the reasonably foreseeable harm connected with their AFFF Products, the design defect with Manufacturer Defendants' AFFF Products existed at the time such products left Manufacturer Defendants' control.

5.26   Due to Manufacturer Defendants' omissions, misrepresentations, and failures to warn consumers or regulators of the harms posed by their AFFF Products, the design defect was not known to users of their AFFF Products.

5.27   Manufacturer Defendants' AFFF Products were unsafe to an extent beyond that which would be contemplated by the ordinary user and, therefore, unreasonably dangerous for their intended use.

5.28   Manufacturer Defendants' AFFF Products have directly and proximately caused and continue to cause injury to Plaintiff. Manufacturer Defendants' AFFF Products released PFAS into the environment, after which this PFAS have migrated and continue to migrate through the environment and contaminate natural resources, including Plaintiff's property. Contamination of natural resources, including drinking water sources from PFAS from AFFF, endangers the public's health and safety and threatens the viability of natural

COMPLAINT FOR DAMAGES – 71

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

resources.

5.29   As a direct and proximate result of Manufacturer Defendants' acts and omissions, the Plaintiff has incurred, is incurring, and will continue to incur in the future, damages related to PFAS contamination of his property. These damages include, but are not limited to, the diminishment of the value and marketability of Plaintiff's property, the cost of remediation and/or mitigation systems for his property, the cost of alternative water, the loss of the use and enjoyment of his property, and annoyance, discomfort, and inconvenience suffered as a consequence of the contamination of his property.

5.30   As a result of Manufacturer Defendants' design and formulation of a defective product, Manufacturer Defendants are strictly liable in damages to Plaintiff.

5.31   As described above, New DuPont and Corteva assumed Old DuPont's design defect liability.

5.32   Manufacturer Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

## COUNT III
## PRODUCTS LIABILITY, FAILURE TO WARN – RCW 7.72 & COMMON LAW
## (ALL DEFENDANTS)

5.33   Plaintiff incorporates and reaffirms the preceding paragraphs.

5.34   Plaintiff brings this claim under the WPLA and the common law.

5.35   Under the WPLA, a manufacturer is liable for failure to warn if its

COMPLAINT FOR DAMAGES – 72

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

product was not reasonably safe because adequate warnings or instructions were not provided, and the product caused harm to the plaintiff. A failure to warn at the time of manufacture occurs when: (1) defendants' products were not reasonably safe at the time of manufacture because of defendants' failure to adequately warn of those products' risks; and (2) the failure to adequately warn caused harm. *See* RCW 7.72.030(1)(b). A failure to warn also can occur after manufacture when a manufacturer learns of or should have learned of a danger connected with its product after it was manufactured. In that instance, a duty arises for the manufacturer to provide a warning as a reasonably prudent manufacturer would have done under similar circumstances, and the manufacturer is liable for failing to warn when a plaintiff is proximately harmed from the manufacturer's failure to warn of the subsequently learned danger connected with the product. *See* RCW 7.72.030(1)(c).

5.36 Under the common law, a product, although faultlessly manufactured and designed, may not be reasonably safe when placed in the hands of the ultimate user without first giving an adequate warning concerning the manner in which to safely use the product. A manufacturer is liable under the common law if it: (1) failed to sufficiently warn of dangers inherent in its product; (2) the product was rendered unreasonably dangerous; (3) plaintiff suffers harm; and (4) manufacturer's failure to warn was the proximate cause of plaintiff's

COMPLAINT FOR DAMAGES – 73

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

damages.

5.37   At the time of manufacture, the likelihood that AFFF Products would cause harm—including but not limited to significant and pervasive contamination of Washington's natural resources, including Plaintiff's land and water supply, that threatens human health and the environment—and  the seriousness of that harm rendered any warnings that Manufacturer Defendants provided inadequate. As such, Manufacturer Defendants' AFFF Products were not reasonably safe because adequate warnings or instructions were not provided. Manufacturer Defendants knew or should have known that their AFFF Products were not safe at the time they left Manufacturer Defendants' control because they contained persistent, bioaccumulative, and toxic chemicals that would be released into the environment.

5.38   Even if the particular dangers connected with AFFF Products were not known to Manufacturer Defendants at the time of manufacture, Manufacturer Defendants learned or should have learned of these dangers after manufacture based on, *inter alia*, the internal studies they conducted. As such, after manufacturing the AFFF Products, the Manufacturer Defendants had a duty to act with regard to issuing warnings concerning the dangers associated with the AFFF Products, as a reasonably prudent manufacturer would have done. Manufacturer Defendants breached this duty by failing to exercise reasonable

COMPLAINT FOR DAMAGES – 74

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA  98101
(206) 501-4446

care in informing users of AFFF Products of their dangers.

5.39   Despite the reasonably foreseeable harm connected with their AFFF Products, Manufacturer Defendants failed to warn, or inadequately warned, of, *inter alia*, the likelihood that PFAS would be released into the environment during the normal use of Manufacturer Defendants' AFFF Products and of the widespread, toxic, and persistent effects of such releases. Because Manufacturer Defendants failed to sufficiently warn of the dangers inherent in their AFFF Products, those products were rendered unreasonably dangerous.

5.40   As a direct and proximate result of Manufacturer Defendants' acts and omissions in failing to warn of the hazards of AFFF Products containing PFAS, Plaintiff's property has become and continues to be contaminated with PFAS for which Plaintiff has incurred, is incurring, and will continue to incur in the future, damages related to PFAS contamination of his property. These damages include, but are not limited to, the diminishment of the value and marketability of Plaintiff's property, the cost of remediation and/or mitigation systems for his property, the cost of alternative water, the loss of the use and enjoyment of his property, and annoyance, discomfort, and inconvenience suffered as a consequence of the contamination of his property.

5.41   As a result of Manufacturer Defendants' failure to provide adequate warnings or instructions at the time of manufacture, Manufacturer Defendants are

COMPLAINT FOR DAMAGES – 75

strictly liable in damages to Plaintiff.

5.42   As a result of Manufacturer Defendants' failure to exercise reasonable care in providing adequate warnings or instructions after manufacture, Manufacturer Defendants are liable in damages to Plaintiff.

5.43   As described above, New DuPont and Corteva assumed Old DuPont's failure to warn liability.

5.44   Manufacturer Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

## COUNT IV
## PRIVATE NUISANCE – RCW 7.48 & COMMON LAW
## (ALL DEFENDANTS)

5.45   Plaintiff incorporates and reaffirms the preceding paragraphs.

5.46   Plaintiff brings this claim under Washington statutory and common law, including but not limited to Chapter 7.48 RCW.

5.47   Under RCW 7.48.120, "[n]uisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property." An actionable nuisance subject to damages and other relief

COMPLAINT FOR DAMAGES – 76

includes "whatever is injurious to health or indecent or offensive to the senses . . . so as to essentially interfere with the comfortable enjoyment of the life and property." *Id.* 7.48.010.

5.48    To be actionable a nuisance "must either injure the property or unreasonably interfere with enjoyment of the property" or as otherwise specifically provided for by statute. *Tiegs v. Watts*, 135 Wash. 2d 1, 13, 954 P.2d 877, 883–84 (1998).

5.49    Plaintiff is an owner of real property with the right of possession.

5.50    Each Manufacturer Defendant engaged in unlawful, intentional, and tortious conduct by manufacturing, marketing, promoting, distributing, and selling AFFF Products that exposed and continues to expose Plaintiff's property to the toxic PFAS family of chemicals, polluted and continues to pollute Plaintiff's water supply, and contaminated and continues to contaminate Plaintiff's property.

5.51    Manufacturer Defendants' above-described unlawful, intentional, and tortious conduct directly and proximately caused a substantial and unreasonable interference with Plaintiff's rights of health and safety, the comfortable enjoyment of life and property, and access to uncontaminated drinking water and other natural resources.

5.52    Past and ongoing PFAS contamination from Manufacturer Defendants' AFFF Products is substantial and unreasonable because it endangers Plaintiff's

COMPLAINT FOR DAMAGES – 77

health, welfare, and safety by exposing him and his property to toxic chemicals and causes significant injuries to Plaintiff's land and water supply, which outweighs any social utility of Manufacturer Defendants' intentional and tortious conduct in manufacturing, marketing, promoting, distributing, and selling AFFF Products while hiding their bioaccumulative, persistent, and toxic nature.

5.53   Manufacturer Defendants' above-described unlawful, intentional, and tortious conduct directly and proximately caused and will continue to cause actual and substantial damages to Plaintiff and his property. These damages include, but are not limited to, the diminishment of the value and marketability of Plaintiff's property, the cost of remediation and/or mitigation systems for his property, the cost of alternative water, the loss of the use and enjoyment of his property, and annoyance, discomfort, and inconvenience suffered as a consequence of the contamination of his property.

5.54   The private nuisance was reasonably foreseeable to Manufacturer Defendants, who knew or should have known that their above-described unlawful, intentional, and tortious conduct would create and continue to create a private nuisance and otherwise harm Plaintiff.

5.55   Accordingly, Plaintiff seeks damages from Manufacturer Defendants, in an amount to be determined at trial, directly resulting from injuries to his property, in a sufficient amount to compensate him for the injuries and losses sustained and to

COMPLAINT FOR DAMAGES – 78

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

restore Plaintiff to his original position, including but not limited to the difference between the current value of his properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous nuisance, and actual, consequential, and nominal damages, flowing from the nuisance which are the natural and proximate result of Manufacturer Defendants' conduct in an amount to be proved at trial.

5.56   Manufacturer Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

5.57   As described above, Corteva and New DuPont assumed Old DuPont's nuisance liability.

**COUNT V**
**TRESPASS – RCW 4.24.630 & COMMON LAW**
**(ALL DEFENDANTS)**

5.58   Plaintiff incorporates and reaffirms the preceding paragraphs.

5.59   Plaintiff brings this claim under RCW 4.24.630 and the common law.

5.60   Under RCW 4.24.630(1), "[e]very person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, is liable to the injured party for treble the amount of the damages caused by the removal, waste, or injury."

5.61   At common law, trespass is an intentional, unprivileged invasion of the

COMPLAINT FOR DAMAGES – 79

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

plaintiff's interest in the exclusive possession of property. A common law trespass occurs when there is: (1) an invasion of property affecting an interest in exclusive possession; (2) an intentional act; (3) reasonable foreseeability that the act would disturb the possessory interest; and (4) actual and substantial damages.

5.62   Each Manufacturer Defendants' intentional, unreasonable, and tortious actions in manufacturing, marketing, promoting, distributing, and selling AFFF Products directly and proximately caused PFAS to wrongfully contaminate and cause harm to Plaintiff's property.

5.63   Manufacturer Defendants knew, or had reason to know, that they lacked authorization to take the above-described actions that would and continue to contaminate and cause harm to Plaintiff's property.

5.64   At all pertinent times, Plaintiff owned the lands and water supply contaminated by Manufacturer Defendants' AFFF Products. PFAS from Manufacturer Defendants' AFFF Products disturb Plaintiff's possessory interest over his land and water supply, as large quantities of PFAS have been and continue to be introduced into Plaintiff's property.

5.65   It was reasonably foreseeable to the Manufacturer Defendants that their above- described tortious acts would disturb Plaintiff's possessory interest over his land and water supply, as large quantities of PFAS have been and continue to be introduced into Plaintiff's property.

COMPLAINT FOR DAMAGES – 80

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

5.66    As a direct and proximate result of Manufacturer Defendants' acts and omissions, Plaintiff has incurred, is incurring, and will continue to incur in the future actual and substantial damages related to PFAS contamination. These damages include, but are not limited to, the diminishment of the value and marketability of Plaintiff's property, the cost of remediation and/or mitigation systems for his property, the cost of alternative water, the loss of the use and enjoyment of his property, and annoyance, discomfort, and inconvenience suffered as a consequence of the contamination of his property.

5.67    Manufacturer Defendants have trespassed on and otherwise wrongfully caused waste, damage, and injury to Plaintiff's property and are liable to Plaintiff for all damages from their unlawful acts and other relief.

5.68    As described above, Corteva and New DuPont assumed Old DuPont's trespass and waste liability.

5.69    Manufacturer Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

## COUNT VI
## PUNITIVE DAMAGES
## (ALL DEFENDANTS)

5.70    Plaintiff incorporates and reaffirms the preceding paragraphs.

5.71    At all times relevant to the present cause of action, Defendants, residents of states that allow punitive damages, manufactured, marketed, and sold the

COMPLAINT FOR DAMAGES – 81

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

fluorochemical products that contaminated Plaintiff's property and resulted in harm that Plaintiff has suffered and will continue to suffer.

5.72  At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their fluorochemical products were toxic chemicals capable of contaminating real property and causing harm to human health.

5.73  Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused Plaintiff's property to be exposed to fluorochemical products.

5.74  Defendants' willful, wanton, malicious, and/or reckless conduct includes, but is not limited to:

a.    issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS;

b.    failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of; and

c.    failing to prevent the foreseeable impacts of fluorochemical exposure upon the Plaintiff's property.

5.75  The foregoing conduct occurred predominantly outside the state of Washington, in states that allow for the recovery of punitive damages, where

COMPLAINT FOR DAMAGES – 82

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

Defendants maintained their headquarters and/or principal place of business.

5.76  Defendants have caused great harm to Plaintiff's property and water supply for which Plaintiff has been forced to incur and will continue to incur significant costs and because of which Plaintiff has suffered and will continue to suffer mental and emotional distress.

5.77  Defendants have demonstrated an outrageous conscious disregard for the physical safety of Plaintiff and his property and acted with implied malice, warranting the imposition of punitive damages.

5.78  Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. Applying a choice of law analysis, the Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

**COUNT VII**
**ACTUAL FRAUDULENT TRANSFER, CHEMOURS SPINOFF – RCW 19.40**
**(OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)**

5.79  Plaintiff incorporates and reaffirms the preceding paragraphs.

5.80  Plaintiff brings this claim under Washington's former Uniform Fraudulent Transfer Act (UFTA), which was in effect at the time of Chemours Spinoff.

5.81  Under the UFTA's actual fraudulent transfers provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

debtor" is voidable as to the creditor's claim. RCW 19.40.041(1)(a) (2015).

5.82   A "creditor" is "a person who has a claim." *Id.* 19.40.011. A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.*

5.83   Plaintiff is and was a creditor of Chemours at all relevant times.

5.84   The Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the Chemours Transfers), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the Assumed Liabilities).

5.85   The Chemours Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

5.86   At the time of the Chemours Transfers and Assumed Liabilities, and until completion of the Chemours Spinoff, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

5.87   Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

COMPLAINT FOR DAMAGES – 84

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

5.88    Plaintiff has been harmed as a result of the Chemours Transfers.

5.89    As described above, Corteva and New DuPont assumed Old DuPont's actual fraudulent transfer liability.

## COUNT VIII
## CONSTRUCTIVE FRAUDULENT TRANSFER, CHEMOURS SPINOFF – RCW 19.40
## (OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)

5.90    Plaintiff incorporates and reaffirms the preceding paragraphs.

5.91    Plaintiff brings this claim under Washington's former UFTA, which was in effect at the time of Chemours Spinoff.

5.92    Under the UFTA's constructive fraudulent transfer provision, a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if the debtor: (1) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," RCW 19.40.041(a)(2)(i) (2015); (2) "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond the his or her ability to pay as they became due," *id.* 19.40.041(a)(2)(ii); or (3) "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation," *id.* 19.40.051(a).

5.93    Plaintiff is and was a creditor of Chemours at all relevant times.

COMPLAINT FOR DAMAGES – 85

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

5.94   Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

5.95   Each of the Chemours Transfers and Chemours's assumption of the Assumed Liabilities was made to benefit, or for the benefit of, Old DuPont.

5.96   At the time of the Chemours Transfers and Assumed Liabilities, and until completion of the Chemours Spinoff, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

5.97   Chemours made the Chemours Transfers and acquired the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

5.98   Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

5.99   At the time of the Chemours Transfers and Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

5.100 Plaintiff has been harmed as a result of the Chemours Transfers.

5.101 As described above, Corteva and New DuPont assumed Old DuPont's constructive fraudulent transfer liability.

## COUNT IX
## ACTUAL VOIDABLE TRANSACTION, CORTEVA SPINOFF – RCW 19.40

COMPLAINT FOR DAMAGES – 86

**(OLD DUPONT, CORTEVA, AND NEW DUPONT)**

5.102 Plaintiff incorporates and reaffirms the preceding paragraphs.

5.103 Plaintiff brings this claim under Washington's current Uniform Voidable Transactions Act (UVTA).

5.104 The UVTA's and UFTA's definitions of "creditor" and "claim," and provisions voiding transfers made with actual fraudulent intent, are substantively identical. *Compare* ¶¶ 5.82-5.83 *with* RCW 19.40.011 (2017) & RCW 19.40.041(a)(1) (2017).

5.105 Plaintiff is and was a creditor of Old DuPont at all relevant times.

5.106 Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through its participation in the DowDuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva from New DuPont, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont ("the Old DuPont Transfers").

5.107 The Old DuPont Transfers were made for the benefit of New DuPont and/or Corteva.

5.108 At the time of the Old DuPont Transfers, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

COMPLAINT FOR DAMAGES – 87

5.109 Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors, including Plaintiff.

5.110 Plaintiff has been harmed as a result of the Old DuPont Transfers.

5.111 Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as Plaintiff, such that they have been damaged as a result of Old DuPont's actions.

**COUNT X**
**CONSTRUCTIVE VOIDABLE TRANSACTION, CORTEVA SPINOFF –**
**RCW 19.40**
**(OLD DUPONT, CORTEVA, AND NEW DUPONT)**

5.112 Plaintiff incorporates and reaffirms the preceding paragraphs.

5.113 Plaintiff brings this claim under Washington's current voidable transactions statute.

5.114 The WTA's and UFTA's provisions voiding constructively fraudulent transfers are substantively identical. *Compare* ¶ 5.92 *with* RCW 19.40.041(a)(1) (2017) & RCW 19.40.051(1) (2017).

5.115 Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through its participation in the DowDuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva from New DuPont, Old DuPont engaged in the Old DuPont Transfers.

COMPLAINT FOR DAMAGES – 88

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

5.116 Plaintiff is and was a creditor of Old DuPont at all relevant times.

5.117 Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

5.118 Each of the Old DuPont Transfers was made to benefit, or for the benefit of, New DuPont and/or Corteva.

5.119 At the time of the Old DuPont Transfers, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

5.120 Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

5.121 Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

5.122 At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

5.123 Plaintiff has been harmed as a result of the Old DuPont Transfers.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and requests the following relief from this Court:

a.    An award of general, compensatory, exemplary, consequential,

COMPLAINT FOR DAMAGES – 89

FRIEDMAN | RUBIN PLLP
1109 FIRST AVENUE, SUITE 501
SEATTLE WA 98101
(206) 501-4446

nominal, and punitive damages;

b.    An award of reasonable attorney fees and costs according to law;

c.    Pre- and post-judgment interest on the damages according to law; and

d.    All such other relief as the Court deems just and proper.

## VII.    JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.


DATED this 2nd day of April, 2026.

FRIEDMAN | RUBIN PLLP

By: /s/ Kenneth R. Friedman
    Kenneth R. Friedman, WSBA No. 17148
    kfriedman@friedmanrubin.com
    /s/ Henry G. Jones
    Henry G. Jones, WSBA No. 45684
    hjones@friedmanrubin.com
    /s/ Ronald J. Park
    Ronald J. Park, WSBA No. 54372
    rpark@friedmanrubin.com
    1109 1st Avenue, Suite 501
    Seattle, WA 98101
    Tel: 206-501-4446
    Fax: 206-623-0794

*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES – 90